Next in number 2010-1105, Sun Pharmaceuticals v. Eli Lilly. But before council approach, why don't you let the present council clear out. Get their opportunity to get their bags together. Before we begin, there is a pending motion in this case by a non-party, Teva Pharmaceuticals to file a brief amicus curiae in the case that motion has been denied for the record. Very well, Mr. Lipsky. Thank you, your honor. May it please the court. There are four basic facts which must be accepted as established if we're to avoid disputed factual questions on this motion for summary judgment, which we contend require reversal of the summary judgment of double patenting below. And those are, number one, that Dr. Hertel first invented and filed a complete and allowable patent application describing gemcitabine, a method of making it, and its antiviral use in March of 1983, ultimately leading to the 614 patent. Second, Drs. Hertel and Grindy thereafter made a second discovery of a new and wholly non-obvious use of gemcitabine in treating cancer and filed a complete and allowable patent application describing that invention in December of 1984. Third, in connection with the filing of a continuation in part application based on Dr. Hertel's original application, he added a one paragraph reference to the newly discovered cancer use for the stated purpose of ensuring compliance with the best mode requirement. And that led to a prosecution that made it unambiguously clear that neither the patent office nor the patent applicant regarded that anti-cancer utility as the utility supporting patent eligibility for those claims. And lastly, Claim 12 of the 614 patent directed to gemcitabine, which was the basis for the double patenting finding below, is entitled under 35 U.S.C. Section 120 to that original March 1983 filing date, whereby only that disclosure, which contains no reference whatsoever to the as yet undiscovered anti-cancer use, is available for determining what the utility was that made that original invention patent eligible. And under those four facts, there's nothing in Geneva that requires forfeiture of otherwise valid separate patent rights on the non-obvious new use simply because the applicant took the step of, as a prophylactic measure, disclosing it in a continuation in part application. Well, your argument is predicated on what you attest you impose, which is essential utility, right? Is there any disagreement? I mean, you would say that's your standard. There are a number of words that could be used to describe it. Here, it's fairly black and white in that in the application, the specification in which this gemcitabine claim has to be interpreted because it's the effective filing date, there isn't any other utility other than the antiviral use. So we avoid, there are difficult cases that could be posited. And indeed, they posit some in their brief that are more difficult than we are. And they are not us. They are not the case where there is only one utility disclosed in the application as of the effective filing date. And it is not this one. Let's assume we reject that. So we're looking at the 614 spec. You're telling us we can't look at the 614 spec. We have to go back to the original. Correct. Let's assume we reject that. So we're looking at the disclosed use. Then we would contend that Geneva, Geneva is a very special kind of case. And what it concluded was that when you have a compound and a sole disclosed utility for it, that utility is required by section 101 in order to make that compound patent eligible. And those are two integral parts of a single invention. And you cannot split those into two separate patents. Okay. And so we accept that as the law. So back to my original question, whether you said solely or whatever, is the test you're advocating here, there's one sole use or an essential use? So the question in what you posited, which is if you reject my argument and look at the CIP spec, the question becomes what is the utility there that is analogous to the utility in Geneva that made the claims patent eligible? Many times you may not be able to tell. Here we can tell because you can see the prosecution history where the examiner said, I don't believe this. You don't need this. Get it out of here. And the applicant said, you're right. I'm not relying on it. It's only there in case I get accused of violating the best mode. And they said it twice. I don't understand. So your point is we limit Geneva to only a situation, which was the situation in Geneva where there was a sole disclosure of sole use, right? That's what Geneva held. Okay. And Pfizer was the same kind of case. Well, Pfizer is a little trickier than Geneva, right, because Pfizer has a very broad disclosure for inflammatory, whatever, that arguably covers 10 dozen things. Correct. Right. And then Pfizer allowed one of any number of uses to then satisfy the double patent. Well, the claims that were specific to, there's an interesting fact in Pfizer, which if you read it in conjunction with the district court opinion, the analgesic and anti-inflammatory use was actually in the reference patent claim through the stipulated meaning of that term therapeutically effective amount. The Pfizer opinion mentions it but doesn't explain why it's important. When you look back at the district court, that was stipulated to mean an amount that gives an anti-inflammatory or analgesic effect in these stated tests. And the district court said you don't even need to look at the specification to see that utility. Those claims on their face were directed to anti-inflammatory activity. But in terms of what Pfizer described as its reasoning, I take it that it was saying that a patent, a prior patent that had multiple utilities, nonetheless all of those utilities could be looked to as performing the same role as the one essential utility in Geneva. Is that not right? I don't think Pfizer quite said that. Because the patent in Pfizer lists not just a class by referencing a class of anti-inflammatories. It specifically lists disease after disease that this drug has utility for treating all the way from, I was just looking at the list, headaches, arthritis, asthma, eczema, migraine headaches, and type 1 diabetes. Why is that different from this case? Setting aside for the moment the unusual fact of this case that you have the later inclusion of the anti-cancer effect. Set that aside. I will set that aside. The Pfizer reference patent claim, the very first patent that had that therapeutically effective language and that specifically included by virtue of the stipulated meaning anti-inflammatory and analgesic. And those claims, there were claims in Pfizer that were specifically to those utilities, the very broadly described utilities, and those were found invalid in the Geneva analysis. If you look at the footnote in Pfizer, the subspecies there, which were not specifically incorporated into that claim, those were dealt with on an obviousness analysis. The court said we find that those uses are obvious variations of the use that was in the prior patent. And the district court here didn't do that kind of analysis at all. The district court applied a bright line test. If it's in the patent specification, it doesn't matter how or why or whether it came in. It doesn't matter if it's obvious or non-obvious. There's a forfeiture if it's in there for any reason, and we think that rule was too broad and unjustified by either Geneva or Pfizer. Okay, so what's your rule? I guess let's go back to the first question. So what's your rule? If that rule is too broad. Our rule is if you accept Geneva, then whatever utility it was or perhaps combinations of utilities that it was, that was necessary in order to establish patent eligibility of the compound claim in the first case, those are things that are joined at the hip under the patent law. So if there are multiple uses, all sort of on the same plane, how does a court go about to decide whether or not one of those meets the test? Well, in many cases, we can see that could be a difficult inquiry. And couldn't that inquiry then lead to never applying a double patenting rejection? Because if your test is for the essential one and there are multiple, no one can ever meet that test. Well, who wins and loses there depends on who the court says has the burden on that issue. In this case, even if we accept that we should be looking at this other specification, which we don't concede, you can see in the record what the utility was. The examiner said the anti-cancer utility is unneeded. In fact, you should take it out. And we said, you're right. We're not relying on it. It's in there just for the best mode. It happened twice. But it's still in there, though, isn't it? It is indeed still in there in part. And why isn't that a disclosure to be subsequently used? It is, if I may back up just a minute. Please. Absolutely. You have a situation where at the time this case came up, there was bona fide uncertainty about when there was an obligation to update the best mode. We concede there are cases going both ways. But the fact that the Transco case in 1984 had to deal with the issue, 1994, tells you that there was some uncertainty. And so you have an applicant who has a burden under the statute. You should disclose the best mode. We have a policy in the patent law. It's best to do it when you disclose information. And he says, you know, I might be accused of doing this. I'm going to tell the public about this. And now to turn around 20 years later and say, and I know you didn't know it then, but the fact that you put that in and did that is we're now going to work a forfeiture of your wholly independent second subsequent invention. It is admittedly obvious. We think that's a harsh rule and bad policy. But to go back to your general rule that you're asking us to embrace, you say, tell me again what it is that you do with a multiple utility case. Do we look through the record to see if we can figure out which of the multiple utilities was really the essential utility? This is what I meant by I think the outcome depends on who has the burden. If I may offer an analogy, we tried very hard in our brief to point out that's a hard case and it's not us. But if we're going to discuss it, you might sort of have to start there and then we can work towards your case. I hope we get there. It might be much like this question of whether there's a prosecution history to stop. And there the court says, well, if you made the amendment, we will assume in the first instance that there is one, unless you can come forward and show from the prosecution history that there wasn't. If that were the rule, then it would fall to the patent owner at that point to try to show that you could tell that one was essential and one wasn't. And if he couldn't, he would lose. If the court applied the other rule and put that burden on the accused infringer who does bear the burden of proof by clearly convincing evidence on issues of validity, then if it was that party's responsibility to prove that it was the essential utility, then that party would lose. But that's only the beginning of the problems, it seems to me, that this rule would entail. I mean, you then have the problem of how do you know whether one characterization of utility actually is multiple utilities because it's written in a broad way. I mean, the example is anti-inflammatories. Well, you know, is that good against a whole bunch of diseases or is it just one utility? I mean, wouldn't that be just a mare's nest for the courts to try to untangle? That could indeed be a difficult question, which is why the correct rule of law we submit is the one that actually is announced in the Seebeck case back in 1965 where the court looked at all these cases, including the bike case, and it said it agreed with what the patent office said. In every case, the issue is the obviousness or non-obviousness of the new use. That is a standard that works every time and gives you the right answer every time. Now, I mean, frankly, if you are going to tie an invalidity holding to the fact that one is now claiming a utility that was essential for Section 101 patent eligibility in the first case, then it seems to me not unreasonable to suggest that somebody should go through that inquiry, and we submit the burden should be on the party challenging the validity of the patent to show that you fit within Geneva and not the burden on us to show that we do not. I mean, it's right, of course, to say that the question is one of obviousness, but the hard part is what you do before you address that question to set up what counts, what qualifies as something that can be considered for purposes of obviousness. And the general rule is you can't look at the spec, but that general rule is subject to some exceptions. I mean, one such exception presumably would be in 112 paragraph 6 type cases where in order to know what the claim says, you have to look at the spec. And it seems to me Geneva is sort of the same quality as that, which is there is a set of circumstances in which you do get to look at the spec. And once you do, then, of course, the obviousness question becomes easy. If you can look at the spec, right? I mean, if you can look at the spec, and once again, setting aside the particular peculiar facts of your case, but if your case were just one in which there were two identified utilities, then the whole game is over once you look at the spec, right, on obviousness. That's not what the decided cases, the earlier CCP cases indicate. I mean, the Maxwell case that we cite, BIC, there were multiple utilities in BIC. BIC didn't hold they were unpatentable because they were disclosed. He held it was unpatentable because it was obvious from the prior art. But the principle of Geneva is that in the context that was before the court in Geneva, you get to look at the spec. So if that principle applies, then it's game over, right? It applies only in the circumstance where the utility that is described in the specification is the one that made the compound patent eligible. That's the rationale. You can't escape that. But that's why the whole game turns on what you get to look at. You said to us a moment ago at a earlier time, the question is the obviousness of the new use, and that's certainly correct. But that question isn't the hard issue in this case. The hard issue is what you get to look at, right? Am I barking up the wrong tree? You seem to have reservations about my characterizations. I do. And the problem we have, you will see in the decided cases that have been cited, statements like in Christman. It says, this is not a case where a compound known to have one use was subsequently discovered unexpectedly to have another. And you will see, like the Schneller case, this is not a case of a subsequent improvement or modification made after filing. That is us. That's exactly what we have here. And in that case, you have to look at the obviousness or non-obviousness of the improvement, modification, or subsequently discovered use. And the problem with the application of Geneva to this case is it was done in a way that avoided doing that obviousness analysis. Game over, as you said. If it's written there in the text of the patent, we don't even look at whether it's obvious. And that's why I'm part in company. I think there are circumstances. You are positing the hard case, and we acknowledge it's the hard case. You have an original application. It's got two utilities disclosed, and the applicant claims one of them. What do you do? All I'm saying is you don't have to resolve that to send us back to the district court. All we want is a district court to look at and decide whether our bona fide, subsequently discovered, subsequently filed on new use is obvious or non-obvious. That's all we're asking for. But the utility was disclosed, though, the first time. The antiviral utility was disclosed the first time, and it was claimed in that patent the first time. And indeed, we've had a trial now in Indiana on this patent on the merits where all those issues have been vetted. And in fact, one of the problems with this case is it's standing in the way of the complete entry of judgment in that case. So we would again ask the court to send us back. Thank you. Well, we will reserve your rebuttal time, and we'll hear from Mr. Hurst. May it please the court. My name is Jim Hurst. I'm here on behalf of Sun Pharmaceuticals. I guess the core issue is whether to apply the sort of straightforward rule from Pfizer and Geneva or to apply this essential utility test that Lilly posited, which in our view is it's unworkable, it's arbitrary, and it should be rejected. We look at this in a very simple way. Lilly had made a deliberate choice here. It has long been the rule that in order to get a compound patent, you have to provide supporting utility. Lilly had control over what it wanted to put into its specification to provide supporting utility for the Gemcitabine compound claim. So your rule is everything? Yes. The answer is if you support a compound claim with a disclosed utility, you can't later get a patent term extending patent on that utility. What's your response to the point that Mr. Lipsy made about what specification we look to, whether we look at the original or the 614 in this case? It has always been the rule in double patenting that you look at the specification of the issued patent. Remember, that's the whole point, right? Because for double patenting, your concern is whether you're getting an unjustified time-wise extension on your patent exclusivity. And that question turns on issued patents and issued dates. It doesn't turn on things like the date of discovery, the date of conception, the date of priority. None of those issues have ever been important to a double patenting analysis, and it ought not be important here. But look at what happened here. Lilly, among the hundreds of compounds, dozens or hundreds, I believe it actually is hundreds of compounds that fall within the scope of the 614 patent, in the specification they call out Gemcitabine just once. And not for its antiviral utility. Rather, they emphasize the anti-cancer utility. They say that it has excellent, quote-unquote, excellent anti-cancer utility. And they say, this is in the specification of the issued patent, column 17, a particularly preferred compound, it's lines 55 through 58, a particularly preferred compound with this utility is the compound of example 8. And that's Gemcitabine. But I thought under your rule, none of that would necessarily matter. I mean, if they hadn't used all of those adjectives, it doesn't matter to the result here. That's your view. It doesn't matter. It just puts a point of emphasis on this being the right result. Because while Lilly says, hey, you should only think about the antiviral utility, the fact of the matter is they added in that CIP a distinct emphasis on Gemcitabines. The very first time they emphasized Gemcitabine individually. And they added the anti-cancer utility. And they said this was our preferred compound. And on top of that, they added an example for the very first time teaching you how to make Gemcitabine. So it's clear from the patent record that the utility that Lilly chose to associate with Gemcitabine is the anti-cancer utility. So even if you were to accept it. You would meet his test? I would meet his test. Which is the essential utility? Absolutely. And here's why I say that. Because, look, before the CIP, they had a large genus of compounds. And they did talk about the antiviral utility. No doubt about that. But they never included any testing for Gemcitabine itself. Completely absent. So this antiviral utility, which was associated with this large genus, had never been tied to Gemcitabine. And so internally we know this from the record, which is the kind of thing you shouldn't be getting into in a double patenting analysis. But their test lends itself to this. We know from the record that Lilly had determined internally between the time they filed the original application and the time they filed the CIP, they had determined internally that Gemcitabine would not be a suitable antiviral. So then when they filed the CIP, they had all this support, further support for their specific claim to Gemcitabine, the anti-cancer utility, the new example about how to make it, calling it a preferred anti-cancer compound. So if their test is right, I say the anti-cancer utility, based on this record, it was the essential utility, and the district court still got it right. The reality is that, in our view, this is a little bit like – Of course, that would require us to do a fair amount of something that sounds an awful lot like fact-finding. And I don't suggest you do it. I suggest you follow – I thought that you would say – There's a simpler test. There's a much simpler test. It's much more elegant and makes it much easier for you to win. And it makes it – that'll even – okay. But, you know, this is sort of like a situation where you can't have your cake and eat it too. And I apologize for being so informal, but Lilly got benefits, okay, from adding this anti-cancer utility during prosecution to its specification. First, if its anti-viral utility failed, and it was suspect, as I described, it had an alternative utility available to support a compound claim to its most promising compound. But I thought the examiner said you don't need it. Well, actually, the examiner said that in the context of the genius of compounds claim. He never said that in the context of the specific claim to gemcitabine itself. And Lilly's response really was, you're right, when the examiner brought that up. You're right. We don't need it. It's extra. It's belt and suspenders. But we all know that when your suspenders snap, it's a good thing you got a belt on. So they had a benefit to claiming the anti-cancer utility, which was that if ever challenged, they had further support for their specific claim to gemcitabine. That was a benefit that they intentionally got – took advantage of when they amended their spec. Another benefit that they got was now they had two pending applications for this anti-cancer utility because they filed another one on the same day. The 826. That's right. The 826. So now they have two applications pending, one before one examiner, one before another examiner. And if they encounter difficulties with one particular application, all they had to do was abandon it and move to the other. But the second one was a method. It was a method, right. But they could have also, if they chose to and they needed to, pursued method claims to treating cancer with gemcitabine in the application that led to the 614. But my point is just this. They made choices that gave them benefits. And with those benefits come consequences. When you intentionally describe your core compound as an anti-cancer agent, having excellent anti-cancer activity, you have tied that utility and that compound together. And under law that existed before Geneva and before Pfizer, that's a single invention entitled to a single patent. Well, Mr. Lipsy makes some policy arguments with respect to trying to promote disclosure. I mean, that might not work in this case because, as you say, they filed the 826 on the same day. But in other circumstances where there's no co-pending application, the policy favoring disclosure would not be well served by the result you're advocating in this case. Well, actually, I disagree, Your Honor, because the reality of how prosecution works is, if they feel like they have truly separate utilities, they can file on the very same day separate applications. Or they can file them all together and rely on the normal procedures in the patent office, which results in restriction requirements, to avoid any double-patenting issues altogether. So this will have no effect on encouraging or discouraging early disclosure. This will never impact the timing of disclosure, contrary to what I think Lilly is positing. Not in the real way that prosecutions are conducted. Now, just a comment on just the practicality of this rule for a second. We do think it's an unworkable rule. And it's fair to say to yourselves, I'm being asked to lay down a rule for future cases. Is this a rule that can be applied in some logical, rational way in the future? And, I mean, I guess I'm hearing a concession that this is true. This essential utility approach would really not work in the normal circumstance where you have a compound claim associated with multiple utilities. How do you choose which is the essential utility and which isn't the essential utility? One of the examples we posited is, what happens if a compound patent gets issued with three separate and distinct utilities being disclosed? Patent owner goes ahead and gets three method patents on each of those individual utilities. Under this essential utility test, only one of the three method patents is invalid for double patenting. But how do you even begin to go about choosing which one would be invalid for double patenting? Under our view, under Geneva, under Pfizer, where there was multiple utilities at issue, the answer's simple. If you choose, and you make a deliberate decision, to support your compound claim with a variety of utilities, you cannot then later get patent term extending method patents on each of those utilities. You can get additional patents, you just have to file terminal disclaimers to avoid the- You could file patents at the same time, separate applications. Absolutely, there's options available to avoid any unfairness. It's also somewhat arbitrary because, again, how you define your utility can be either broad or narrow, depending how you choose to do it. In this case in particular, the earliest application discloses that gemcitabine is an antimetabolite. An antimetabolite is the way in which it treats- allegedly treats viruses and treats cancer. So it's a broad enough disclosure in the original utility to fall squarely within the Pfizer case, where you have the broad anti-inflammatory disclosure, and that ends up resulting in double patenting for arthritis, fever, pain. Same case to us, there's no meaningful way to distinguish the Pfizer case from our case. You know, in the end, I guess our main point here is there's really no reason to strain to find an exception to Pfizer in Geneva. Here, the result would only to give Lilly a two years extra patent exclusivity on a utility that is really the only practical utility that's ever been associated with this compound. Lilly got all it was entitled to under the patent laws. When it got a compound patent, that emphasizes that gemcitabine is an anti-cancer agent. They get all they were entitled to. And as a result, the district court should be affirmed. There's no further questions. Thank you, your honors. Thank you, Mr. Hurst. And Mr. Lipsy, we'll give you your reserved two minutes. Well, we'll give you two, and if you need more, I think, to be fair, we'll give you a little more. The bulk of what you've just heard is either wildly speculative or hotly contested, or both. Whether what the only real utility is, it was filed originally as an antiviral claim. That claim was issued in the 614 patent. It's presumed valid. There's testimony in the record that Dr. Hurdle continued to evaluate it. All of that is hotly contested, and that basically is the major reason this case needs to go back. Well, but let me ask you this. Suppose that, unlike the facts of this case, you had discovered, or just decided in the course of prosecution, that the antiviral use was really not only counter-indicated because of the toxicity problem, but it wasn't even, you concluded that your original tests really weren't valid and that it didn't have that effect. But it did have this other effect of anti-cancer, and therefore, you ended up, late in the prosecution, putting in the anti-cancer effect as the utility. Geneva would apply, correct? It would, because the effective filing date of those claims would be when you put that in. And this is why there is a game over answer to this whole point. And that is, claim 12 of the 614 patent claiming gemcitabine itself, which was the foundation for the double patenting rejection, is entitled to the original application filing date of March 1983 under 35 USC 120. We know that because they themselves contend it's prior art as of that date, and it can't be, unless it's entitled to that filing date, can't be entitled to the filing date unless it had an enabling disclosure of how to make and how to use, which it did. It disclosed how to use it as an antiviral use. And if there's going to be any controversy about that, this case has to go back, because there are factual disputes. Once you determine that that claim is entitled to that original application filing date, you cannot construe it in any specification other than the one that existed on the effective filing date. Why? Because that would be tantamount to taking a claim that had an effective filing date and construing it in light of new matter that was added years later. The court would never allow you to do that, and rightly so. That's why the Phillips case says we construe the claim as of the effective filing date. And as of the effective filing date, the specification in which that claim appeared, which completely enabled it, including disclosing a legitimate use, because otherwise it would be entitled to the filing date, that specification didn't say thing one about cancer. And the only way you get that anti-cancer utility into the Geneva analysis is by improperly interpreting that claim on a specification that was not the specification at the effective filing date. Now, just one factual point. He said, well, you didn't even mention gemcitabine in the original case. He said, you didn't even mention gemcitabine in the original case. It's not so. It's specifically enumerated at page 6, lines 15 and 16 of the original specification at A194 in the record. And if we're here talking about, well, antiviral wasn't a real utility, and oh, you might have done something else, and you could have done something else, we've got to go back for factual disputes. These facts do not appear in any decided case of this quarter its predecessor. It is a kit fact pattern that shows these were two legitimate separate inventions made at separate times by separate people, filed in separate patent applications, the second of which on this record is wholly unobvious from the first, and to deny separate patent protection because the applicant took the extra step trying to make sure he had done what we're supposed to do and tell the public about benefits of the invention, that would be a harsh rule indeed. Thank you very much. Thank you, Mr. Lipsy and Mr. Hersh. The court appreciates the argument of both counsel and the cases submitted.